UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT FORBES,

            Plaintiff,

   v.

JOHN DOE, SGT. ANTHONY
BONGIOVANNI, CITY OF ROCHESTER,
OFFICER MICHAEL DIMAURO, and
OFFICER CHRISTINA MOORHOUSE,

            Defendants.
_____

**DECISION AND ORDER**

6:18-CV-06700 EAW

**INTRODUCTION**

*Pro se* plaintiff Robert Forbes ("Plaintiff") brings this action under 42 U.S.C. § 1983, asserting claims against Defendants Sergeant Bongiovanni ("Bongiovanni"), Officer Michael DiMauro ("DiMauro"), Officer Christina Moorhouse ("Moorhouse"), Officer John Doe, and the City of Rochester. Pending before the Court is Plaintiff's motion for summary judgment. (Dkt. 65). For the following reasons, Plaintiff's motion is denied.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Statement of Facts (Dkt. 65 at ¶¶ 6-62), Defendants' Statement of Undisputed Facts (Dkt. 71-11), and the exhibits submitted by the parties. Unless otherwise noted, these facts are undisputed.

On June 10, 2017, Latoya Black ("Ms. Black"), the mother of Plaintiff's two-year-old daughter, picked Plaintiff up at the intersection of Dewey Avenue and Electric Avenue in Rochester, New York. (Dkt. 65 at ¶¶ 6-7, 9-11; Dkt. 71-11 at ¶¶ 1-2, 4-6). As Ms.

Black, Plaintiff, and their daughter headed south on Dewey Avenue, the adults noticed a police vehicle behind them. (Dkt. 65 at ¶ 14; *see* Dkt. 71-4 at 3). Two members of the Rochester Police Department ("RPD"), Defendants Bongiovanni and DiMauro, pulled Ms. Black's vehicle over. (Dkt. 65 at ¶ 16; Dkt. 71-11 at ¶ 11). According to Bongiovanni, the officers initially stopped Ms. Black's vehicle because of the tinted windows, which appeared to violate New York Vehicle and Traffic Law § 375(12-a)(b), and because the officers suspected that the occupants were involved in an illegal drug transaction. (Dkt. 71-11 at ¶¶ 7-10, 14; *see* Dkt. 72 at ¶¶ 9-11).

The officers approached Ms. Black's vehicle on the passenger side, where Plaintiff was sitting. (Dkt. 65 at ¶ 17; *see* Dkt. 72 at ¶ 12). Bongiovanni spoke with Plaintiff and Ms. Black, and both occupants voluntarily provided identification. (Dkt. 65 at ¶¶ 23-24; Dkt. 71-11 at ¶¶ 18-19). Bongiovanni also asked Ms. Black where she "got the tint done on the car." (Dkt. 27 at 00:39-00:42).[1] Ms. Black explained that someone had tried to match the tint to the original windows, and Bongiovanni advised her that under a new, "tough" law, the tint would prevent her from receiving a passing inspection in the future. (*See id.* at 00:43-01:07). Bongiovanni further advised Ms. Black that even though her current state inspection might be good for the year, "[she] could still get a ticket from a

---

[1]   Both parties submitted, and rely upon, the footage captured by Bongiovanni's and DiMauro's body-worn cameras. (*See* Dkt. 27; Dkt. 71-3). "Video footage can, but does not always, conclusively establish facts for purposes of summary judgment." *Bradley v. Bongiovanni*, No. 18-CV-6823-FPG, 2021 WL 3635206, at *1 (W.D.N.Y. Aug. 17, 2021). The references herein to the statements reflected in the body-worn cameras reflect the Court's transcription based on its review of the footage.

policeman," but he thought that they "would be all set as long as everything [was] good" with the ID check. (*See id.* at 1:07-1:15).

Bongiovanni and DiMauro returned to their patrol car and subsequently learned that Plaintiff was on parole for a state weapons conviction. (Dkt. 65 at ¶ 25; *see* Dkt. 72 at ¶ 15). Bongiovanni stated, "I'd like to get him out of the car, to see if he's got a weapon on him." (Dkt. 27 at 04:18-04:21). Bongiovanni then told DiMauro:

> I'll tell you what we'll do. We'll ask him if he wants to step out real quick. We'll give him the choice. I don't smell any marijuana in the car, and she pulled right over. The only thing I got on her right now is some dark tint. We'll see how well he cooperates. We'll ask him if there are any weapons in the car. Then we'll ask her for consent. If she says no, I'm good with it. If she says yes, then maybe we can get one. Let's go check with them.

(*Id.* at 04:44-05:15).

The officers returned to the passenger side of Ms. Black's vehicle, and Bongiovanni inquired about Plaintiff's parole status. (*See id.* at 05:20-05:45). Bongiovanni then asked Plaintiff whether the two of them could speak privately on the sidewalk outside of the car, but he assured Plaintiff that "he was not under arrest." (*See id.* at 05:46-05:53). Plaintiff replied that Bongiovanni was making him "nervous" and that he would rather "[Bongiovanni] talk with [him] right here." (*Id.* at 05:54-06:09). Bongiovanni asked Plaintiff whether there were any weapons or anything illegal in the car, and Plaintiff replied that there was not. (*Id.* at 06:10-06:25).

After some back-and-forth, Bongiovanni stated that he "would like to get to know [Plaintiff]" and had seen Plaintiff "on a corner where they're shooting a lot of guns." (*Id.* at 06:30-06:45). Bongiovanni then unlocked Plaintiff's door with his left hand, opened the

door with his right, and told Plaintiff, "I just want you to step out and have a conversation, that's all, you're not under arrest." (*Id.* at 06:48-06:56).

Plaintiff exited the vehicle, and Bongiovanni began to search him. (*Id.* at 07:22-07:38). After Bongiovanni searched Plaintiff's arms and posterior legs, DiMauro held Plaintiff's arms behind his back while Bongiovanni searched Plaintiff's anterior legs, chest, and groin. (*Id.* at 07:40-08:15; *see* Dkt. 65 at ¶ 39; Dkt. 71-11 at ¶ 34). Bongiovanni felt the inside of Plaintiff's waistband and grabbed Plaintiff's belt buckle. (*See* Dkt. 27 at 08:15-08:18). At that point, Plaintiff fled from the officers. (*Id.* at 08:18-08:20; *see* Dkt. 65 at ¶¶ 40-41; Dkt. 71-11 at ¶¶ 35-36).

The officers chased Plaintiff behind the detached garage at the rear of 259 Albemarle Street and arrested him. (Dkt. 65 at ¶¶ 40-41; Dkt. 71-11 at ¶¶ 35-36). An additional responding member of RPD, Defendant Moorhouse, found several vials of marijuana on the opposite side of the fence from where Plaintiff was taken into custody. (Dkt. 65 at ¶ 45; Dkt. 71-11 at ¶ 40; *see* Dkt. 71-7 at 1). Plaintiff was charged with both Obstruction of Governmental Administration in the Second Degree and Unlawful Possession of Marihuana in the Second Degree and taken to the Monroe County Sheriff's Office for booking. (Dkt. 65 at ¶¶ 47-48; Dkt. 71-11 at ¶¶ 42-43; *see* Dkt. 75 at 39). As Plaintiff underwent booking, a glass vial of marijuana fell out of his right pant leg. (Dkt. 71-11 at ¶ 41; *see* Dkt. 71-8 at 3). Plaintiff was further charged with Possession of Contraband in Prison in the Second Degree. (Dkt. 65 at ¶ 48; Dkt. 71-11 at ¶ 43; *see* Dkt. 71-8 at 1). Plaintiff's charges were later dismissed. (*See* Dkt. 65 at ¶ 52; Dkt. 71-11 at ¶ 47; Dkt. 75 at 39).

## PROCEDURAL BACKGROUND

Plaintiff filed his initial complaint on September 27, 2018. (Dkt. 1). Upon screening pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, the Court entered a Decision and Order finding that Plaintiff had failed to allege a viable claim against any of the defendants but affording him an opportunity to amend. (Dkt. 7).

Plaintiff filed an amended complaint on July 5, 2019. (Dkt. 8). On April 6, 2020, the Court entered a screening order, dismissing Plaintiff's claims against RPD and the Monroe County Sheriff, as well as his claims for negligence, *prima facie* tort, punitive damages, and his claims brought under the New York State Constitution. (Dkt. 9). Plaintiff was allowed to proceed to service on claims of excessive force, false arrest and false imprisonment, and unreasonable search and seizure pursuant to § 1983, and on state law claims for false arrest and false imprisonment, assault and battery, negligent hiring, intention infliction of emotional distress ("IIED"), and malicious prosecution. (*Id.* at 18-19).

Defendants answered the complaint on June 23, 2020. (Dkt. 20). On June 10, 2021, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[2] (Dkt. 40). On January 18, 2022, the Court granted Defendants' motion as to Plaintiff's § 1983 claims against the City of Rochester, as well as to his state law negligent hiring claim, but denied Defendants' motion in all other aspects. (Dkt. 50).

---

[2] Defendants purportedly brought the motion to dismiss under Rule 12(b)(6), but since the motion was filed more than a year after answering Plaintiff's amended complaint, the Court treated it as a motion for judgment on the pleadings pursuant to Rule 12(c). *See, e.g.*, *Wojtczak v. Safeco Prop. & Cas. Ins. Cos.*, 669 F. Supp. 2d 305, 311 (W.D.N.Y. 2009).

On August 7, 2023, Plaintiff filed a motion for summary judgment. (Dkt. 65). Defendants responded on October 30, 2023 (Dkt. 71), and Plaintiff replied on December 6, 2023 (Dkt. 75).

## DISCUSSION

### I. Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact . . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*,

781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In addition, "[i]t is well settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (italics in original) (internal quotation marks and citation omitted). Despite this liberal approach, "where the movant fail[s] to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (internal quotation marks and citation omitted).

## II. Plaintiff's False Arrest Claims

Plaintiff argues that he is entitled to summary judgment because Bongiovanni and DiMauro falsely arrested and falsely imprisoned him in violation of the Fourth Amendment. (*See* Dkt. 65 at ¶¶ 64-90). The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable

cause . . . ." U.S. Const. amend IV.  "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law," *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted), and "[c]laims for false arrest and false imprisonment are essentially the same causes of action," *Dickerson v. Monroe Cnty. Sherriff's Dep't*, 114 F. Supp. 2d 187, 191 (W.D.N.Y. 2000).

Under New York law, a false arrest occurs where: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (first alteration in original) (internal quotation marks and citation omitted); *see D'Amico v. Corr. Med. Care, Inc.*, 120 A.D.3d 956, 961 (4th Dep't 2014).  The element at issue in this case is whether Defendants' confinement of Plaintiff was privileged, *i.e.*, whether Bongiovanni and DiMauro had probable cause or reasonable suspicion to detain Plaintiff.  *See Martinez v. Cty. of Schenectady*, 97 N.Y.2d 868, 873-74 (2001) ("The existence of probable cause serves as a legal justification for the arrest and an affirmative defense to the claim [of false imprisonment].");  *accord Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).  The issue of whether an officer has probable cause or reasonable suspicion sufficient to detain an individual is a mixed question of law and fact. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996); *accord United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015).  For the reasons set forth below, the Court concludes that Plaintiff is not entitled to summary judgment on his false arrest claims under § 1983 and New York law.

### A. Initial Traffic Stop

Plaintiff argues that Bongiovanni and DiMauro did not have probable cause for the initial stop of Ms. Black's vehicle. (*See* Dkt. 65 at ¶¶ 64-74). In response, Defendants argue that the traffic stop was "supported by probable cause, [or] at least reasonable suspicion." (Dkt. 71-12 at 4).

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity or a traffic violation." *United States v. Diaz*, 802 F.3d 234, 238 (2d Cir. 2015) (internal quotation marks and citation omitted). "Accordingly, such [traffic] stops must be justified by probable cause or a reasonable suspicion . . . ." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (internal quotation marks and citation omitted); *see United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("[R]easonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."). The subjective intent of an officer performing a traffic stop is irrelevant. *See United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.").

Here, Bongiovanni and DiMauro had probable cause to stop Ms. Black's vehicle if it was objectively reasonable to believe that her windows were illegal under New York Vehicle and Traffic Law § 375(12-a)(b). *See United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001). Indeed, "[s]topping a vehicle based upon probable cause or reasonable

suspicion that a vehicle is being operated with tinted windows in violation of § 375(12-a)(b)(2), even if the officers' true motivations are driven by a desire to investigate other illegal activity, complies with the Fourth Amendment." *United States v. Lucas*, 338 F. Supp. 3d 139, 154 (W.D.N.Y. 2018), *aff'd*, No. 19-3937-CR, 2021 WL 3700944 (2d Cir. Aug. 20, 2021). For traffic stops based on illegal window tint, "[t]he legal test . . . is whether the police officer reasonably believes the windows to be over-tinted in violation of Vehicle and Traffic Law § 375(12-a)(b)," and an officer's "testimony that he could not see into the [ ] vehicle meets that test." *People v. Biggs*, 208 A.D.3d 1340, 1344 (2d Dep't 2022).

In his affidavit, Bongiovanni states that Ms. Black was pulled over, at least in part, because the officers could not see the occupants of the vehicle through the tinted windows. (*See* Dkt. 72 at ¶ 11).[3] Bongiovanni's statement creates a genuine issue of material fact as to whether the officers reasonably believed that Ms. Black's window tint was illegal under § 375(12-a)(b). Accordingly, Plaintiff's request for summary judgment is denied.

**B.    Search of Plaintiff's Person**

Plaintiff also argues that Bongiovanni and DiMauro impermissibly extended the initial traffic stop to include a search Plaintiff's person. (*See* Dkt. 65 at ¶¶ 68, 70-71, 73-74, 88-90). Defendants respond that the officers had a reasonable suspicion of criminal

---

[3] Plaintiff objects to Defendants' reliance on Bongiovanni's affidavit, which was submitted initially without being signed and notarized. (*See* Dkt. 75 at 30). However, within a matter of days after the initial filing, Defendants quickly filed a corrected version of the affidavit. (Dkt. 72). While Defendants are cautioned to be more careful moving forward, the Court will accept the corrected version of Bongiovanni's affidavit.

activity, and that Plaintiff was armed. (*See* Dkt. 71-12 at 4-8). Defendants also argue that Plaintiff's status as a parolee is relevant to the analysis. (*Id*. at 7).[4]

"Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Hagood*, 78 F.4th 570, 575-76 (2d Cir. 2023) (internal quotation marks and citation omitted). "The *Terry* investigative stop and frisk is one such exception." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968).

In the context of a traffic stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). However, "a traffic stop may be extended beyond

---

[4] Defendants' argument in this regard is not well developed. It is true that "[p]arolees subject to terms and conditions of release 'have severely diminished expectations of privacy by virtue of their status alone.'" *United States v. Quinones*, 457 F. App'x 68, 69 (2d Cir. 2012) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). It is also true that state law and federal law concerning the search of a parolee do not necessarily mirror each other. *See United States v. Braggs*, 5 F.4th 183, 186 (2d Cir. 2021) (discussing inapplicability of state law provisions requiring reasonable suspicion for search of a parolee in context of exclusionary rule in federal criminal proceeding). Because the Court concludes that issues of fact defeat Plaintiff's summary judgment motion under generally applicable Fourth Amendment jurisprudence, it need not and does not analyze Plaintiff's expectation of privacy in the context of his parole status. *United States v. Chandler*, 56 F.4th 27, 42 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1791, 215 L. Ed. 2d 676 (2023) ("We do not apply *Braggs* or the Special Needs Doctrine here, having concluded on the record before us that the search of Chandler's residence and car rested squarely on reasonable suspicion.").

the point of completing its mission if an officer develops a reasonable suspicion of criminal activity." *United States v. Wallace*, 937 F.3d 130, 138 (2d Cir. 2019) (alteration, internal quotation marks, and citation omitted). Additionally, a law enforcement officer may frisk an individual for weapons if the officer has "a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is armed and dangerous." *Weaver*, 9 F.4th at 139 (internal quotation marks and citation omitted).

"Reasonable suspicion is less than probable cause and must be established by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Hagood*, 78 F.4th at 576. "This objective inquiry disregards the officer's subjective motivation and asks instead whether a reasonable officer would suspect unlawful activity under the totality of the circumstances." *Diaz*, 802 F.3d at 239. "Contextual considerations such as the fact that the stop occurred in a high crime area, factor into a reasonable-suspicion analysis, and the officers' assessment of an individual's nervous or evasive behavior is pertinent in establishing reasonable suspicion." *Hagood*, 78 F.4th at 576 (internal quotation marks and citation omitted). The facts are not considered in isolation but rather "the totality of the circumstances" must be evaluated "through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training." *Id*.

According to Bongiovanni, the officers: (1) spotted Ms. Black's vehicle parked at an intersection allegedly known to be an open-air drug market and at which gunshots had been reported; (2) observed Ms. Black's vehicle take a "circuitous route" back to Dewey Avenue; and (3) could not see the occupants of Ms. Black's vehicle through the tinted

windows. (*See* Dkt. 72 at ¶¶ 6-11). Plaintiff challenges the sufficiency of Defendants' evidence for those factual circumstances. (*See, e.g.*, Dkt. 65 at ¶¶ 69, 72; Dkt. 75 at 28). Such arguments demonstrate Plaintiff's misunderstanding of his own evidentiary burden as the party moving for summary judgment. *See Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (holding that even an "unopposed summary judgment motion may [ ] fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." (internal quotation marks and citation omitted)). Defendants have sufficiently "set forth specific facts showing that there is a genuine issue for trial" as to whether Bongiovanni and DiMauro had a reasonable suspicion of criminal activity. *See Anderson*, 477 U.S. at 256.

Turning to whether the officers reasonably suspected that Plaintiff was armed and dangerous, Bongiovanni provides the following description:

> After learning of [Plaintiff's] parole status and the gun charge, I wanted to speak to [Plaintiff] more, as to his reason for being on the violent corner at an intersection suspected of being an open[-]air drug market. I was concerned about [the] possession of the gun charge and the criminal history of [Plaintiff] and therefore when I re-approached the vehicle I did so with caution based on my experience as a police officer. I approached the passenger side and informed [Plaintiff] that he was on parole for a criminal offen[s]e involving a weapon. I asked [Plaintiff] to step out of the vehicle; [Plaintiff] informed me that he was nervous and refused to step out of the vehicle. I asked a second time for [Plaintiff] to step out and [I] unlocked the door and ordered [Plaintiff] to keep his hands where I could see them because of: (1) the refusal to step out of the vehicle as ordered (2) [Plaintiff's] parole status and (3) my fear of a weapon based on [Plaintiff's] criminal history.

(Dkt. 72 at ¶¶ 15-18). Plaintiff does not challenge the fact that he was on parole or that he refused Bongiovanni's initial requests to step out of the vehicle. (*See* Dkt. 65 at ¶¶ 32-36). However, Plaintiff argues that Bongiovanni really did not fear that Plaintiff was armed and

- 13 -

dangerous. (*See id.* at ¶ 73). Not only are issues of Bongiovanni's credibility inappropriate for resolution on summary judgment, *see, e.g.*, *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (internal quotation marks and citation omitted)), but the inquiry is an objective one, so that the issue is not centered on Bongiovanni's subjective motivation but rather whether "a reasonable officer would suspect unlawful activity under the totality of the circumstances," *Diaz*, 802 F.3d at 239. Plainly, this is an issue of fact that cannot be resolved on summary judgment.

      C.    **<u>Plaintiff's Arrest</u>**

Plaintiff's final argument pertaining to his false arrest claims is that Bongiovanni and DiMauro did not have probable cause to arrest him for Obstruction of Governmental Administration in the Second Degree ("OGA"). (*See* Dkt. 65 at ¶¶ 99-105). Defendants respond that the officers had probable cause for the OGA arrest "by the fact that Plaintiff broke from the detaining officers while they were questioning [him] . . . ." (*See* Dkt. 71-12 at 14).

In New York, an individual commits OGA when he "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ." N.Y. Penal Law § 195.05. "Any interference must be physical and must obstruct an 'official

function . . . authorized by law.'" *Dancy v. McGinley*, 843 F.3d 93, 111 (2d Cir. 2016) (citations omitted).

Here, both parties focus on whether Plaintiff's flight during Bongiovanni's and DiMauro's search of his person constituted "physical force or interference" sufficient to give the officers probable cause for the arrest. (*See* Dkt. 65 at ¶ 99; Dkt. 71-12 at 14). But a threshold issue is whether the stop and frisk was legal. While "[p]robable cause to arrest for a violation of § 195.05 may be predicated on, amongst other things, obstructing a lawful search . . . resisting an illegal search cannot constitute [OGA]." *Walker v. Carrozzo*, No. 21-CV-2975 (KMK), 2023 WL 2664610, at *7 (S.D.N.Y. Mar. 28, 2023) (internal quotation marks and citation omitted); *see Dancy*, 843 F.3d at 112 ("[Plaintiff's] actions could not have constituted [OGA] because [Defendant's] *Terry* stop and frisk were unauthorized."). Because there is a genuine issue of material fact as to whether Bongiovanni's and DiMauro's search of Plaintiff was legal, there is also a genuine issue of material fact as to whether the officers had probable cause to arrest Plaintiff for OGA.

### III.  Plaintiff's Excessive Force Claims

Plaintiff also seeks summary judgment on his Fourth Amendment excessive force and New York assault and battery claims. (*See* Dkt. 65 at ¶¶ 92-97). Plaintiff asserts that both Bongiovanni and DiMauro "committed multiple instances of wrongful physical contact and [ ] intentional[ly] plac[ed him] in fear of such [ ] contact." (Dkt. 65 at ¶ 92). Defendants respond that the officers used the appropriate amount of force necessary to effectuate Plaintiff's lawful arrest. (*See* Dkt. 72-12 at 11-12).

"The Fourth Amendment protects individuals from seizures executed with excessive force," *Dancy*, 843 F.3d at 116, and "[e]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims] are substantially identical," *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (second alteration in original) (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)). "Whether the force used was excessive is analyzed under the Fourth Amendment's 'reasonableness' standard, and determined by 'balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.'" *Dancy*, 843 F.3d at 116 (quoting *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)).

In evaluating the reasonableness of an officer's conduct, courts "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). These factors are viewed from the perspective of a reasonable officer at the time of the incident. *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, Plaintiff has not met his burden of establishing that the officers' use of force was excessive as a matter of law. *See Adamson v. Miller*, 808 F. App'x 14, 16-17 (2d Cir. 2020) ("The central dispute in this claim is a factual one: whether Adamson was placed in

a chokehold and punched. A genuine issue as to that material fact would be sufficient to defeat summary judgment . . . ."). For instance, while Plaintiff claims that his handcuffs were overly tight, causing pain and wrist injuries that led to carpal tunnel syndrome (*see* Dkt. 65 at ¶¶ 4(iii), 57), the officers adjusted Plaintiff's handcuffs on at least two occasions after Plaintiff complained that they were too tight, (*see* Dkt. 27 at 14:45, 29:18 (Bongiovanni); *id.* at 51:50, 1:05:45 (DiMauro)). And there is no evidence in the record that it was unreasonable for the officers to handcuff Plaintiff upon arrest for OGA. *See, e.g.*, *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019) ("The question is . . . whether an officer reasonably should have known during handcuffing that his use of force was excessive. A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress . . . such that a reasonable officer would have been aware of her pain, or both.").

Plaintiff also claims that DiMauro used excessive force when he: (1) held Plaintiff's hands behind his back while Bongiovanni searched for weapons; (2) held Plaintiff in a chokehold after the officers pursued Plaintiff on foot; and (3) placed his bodyweight on Plaintiff to prevent Plaintiff from fleeing again. (*See* Dkt. 65 at ¶¶ 94-96). But the officers' body camera footage does not establish that, during the initial search for weapons, DiMauro held Plaintiff's arms in a manner likely to cause injury. (*See* Dkt. 27 at 07:45 (Bongiovanni); *id.* at 44:30 (DiMauro)). The footage also does not establish that DiMauro placed Plaintiff in a chokehold as opposed to "put[ting his] left arm around the top of [Plaintiff's] right shoulder, and [his] left forearm on [Plaintiff's] upper torso" and "appl[ying his] body weight to prevent [Plaintiff] from standing up while maintaining the

escort hold of [Plaintiff's] left arm with [his] right hand." (*See* Dkt. 75-5 at 1).[5]  As such, there are genuine issues of material fact precluding summary judgment in Plaintiff's favor on his excessive force, assault, and battery claims.

## IV. <u>Plaintiff's Malicious Prosecution Claim</u>

Lastly,[6] Plaintiff seeks summary judgment on his malicious prosecution claim, asserting that Bongiovanni, DiMauro, and Morehouse knew that Plaintiff had not committed any crimes on June 10, 2017.  (*See* Dkt. 65 at ¶ 108).  As such, according to Plaintiff, his prosecution was not supported by probable cause, which "generally creates an inference of malice."  (*See id.*).

---

[5]  To the extent Plaintiff moves for summary judgment against Bongiovanni on a "failure-to-intervene" theory, "a plaintiff must show that the defendant (1) possessed actual knowledge that a fellow officer was using excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force."  *Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 221 (W.D.N.Y. 2012).  The officers' body camera footage creates a genuine issue of material fact as to whether Bongiovanni intentionally refused or failed to take reasonable measures to end DiMauro's alleged use of excessive force.

[6]  Plaintiff also asserts an IIED claim, but does not expressly move for summary judgment on that claim.  (*See* Dkt. 65 at ¶ 109; *see also* Dkt. 8 at ¶¶ 175-78).  Even if properly raised, the Court would deny a motion directed to this claim as there are plainly issues of fact as to whether Plaintiff can establish a claim for IIED against Defendants.  *See Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993) (discussing that, to establish an IIED claim in New York, an individual must show: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.").

In addition, Defendants argue that Bongiovanni, DiMauro, and Morehouse are entitled to qualified immunity, and for that reason alone, Plaintiff's motion for summary judgment should be denied.  (*See* Dkt. 72-12 at 16-17).  Because the Court has otherwise determined that issues of fact prevent a finding of liability in favor of Plaintiff on his claims, the Court does not reach this issue.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (internal quotation marks and citation omitted). To succeed on a "malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Watkins v. Town of Webster*, 592 F. Supp. 3d 96, 112 (W.D.N.Y. 2022) (citations omitted). Malicious prosecution claims under § 1983 require an additional showing of a "sufficient post-arraignment liberty restraint." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

Here, Plaintiff is not entitled to judgment as a matter of law on his malicious prosecution claims because, among other things, there is a genuine issue of material fact as to whether Plaintiff's arrest for OGA was supported by probable cause. *See, e.g.*, *Rutherford v. Cty. of Mount Vernon*, No. 18 Civ. 10706 (AEK), 2023 WL 6395375, at *18 (S.D.N.Y. Sept. 29, 2023) ("For the reasons discussed above, . . . there are material facts in dispute that prevent the Court from making a finding as to whether there was probable cause to arrest Mr. Rutherford, let alone to pursue a prosecution." (internal citation omitted)). Plaintiff's motion for summary judgment on his malicious prosecution claims is therefore denied.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment (Dkt. 65) is denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:   January 29, 2024
         Rochester, New York